The first case on the calendar is Matthew Lombardo v. Dr. Seuss Enterprises. Thank you. Thanks. Thirsty this morning. May it please the Court, my name is Andrew Deutsch. I am speaking for Dr. Seuss Enterprises. The opinion below made three fundamental errors at the Rule 12c stage in finding the play Whose Holiday to be a fair use of Dr. Seuss's How the Grinch Stole Christmas and dismissing the complaint. Under novel review, the Court should reverse and remand. On the first factor of fair use, Mr. Lombardo did not transform the material he took from Grinch. He simply did two things. He retold the second half of the Grinch book, using different words but as a very close paraphrase, without alteration, without new insights and without new meaning. And the second half of the play is a sequel. He takes the same characters, starts them at the end of Dr. Seuss's story and tells a new story, again without transforming the original material or commenting on the original material in a transformative manner. I'm not sure I'm quite following that. If he uses the material to tell a new story, why isn't that transformative? Because it is the right, one of the most important rights in the hands of the copyright owner is a derivative right. And one of the derivatives rights is to make sequels using the original characters. This isn't a sequel. It's a, depending on one's viewpoint, it's either a crude use of your client's material or an adult use of your client material. It's not a sequel. I beg to differ, Your Honor, because none of what appears in the second half of the play appears in the Grinch, other than the characters. The definition of a sequel, I think we have three dictionary definitions in our brief, is you start where the old story left off and you continue the story. And that's what he does. He picks up Cindy Lou Who at 18 and the Grinch at whatever age the Grinch is and then tells a whole series of stories, adult they may be, but they have nothing to do with the original story at all. That's why it's transformative. It's not transformative in a sense that's protected by the fair use doctrine. The rights, for example, if you've ever read the Sue Grafton books, Sue Grafton had the same character in A is for I forget what, and all the way through the next 25 books used the same character in the same setting in different stories. And that is one of the core rights. Sue Grafton, and you're going to tell me Theodore Geisel would have written this? I'm telling you that Dr. Seuss' estate, the Dr. Seuss Enterprise, has authorized a number of Grinch stories based on the characters telling different stories. I'm not saying Dr. Seuss would have written this. I'm saying this is an appropriation of the right that belongs to Dr. Seuss in today's terms to his estate. So that would go to the factor of the market for other works? No, it goes to the first factor, Your Honor. There is simply no transformation. The first part, which I have to emphasize, 60 lines of this play is nothing more than retelling the second half of The Grinch. Everywhere where Cindy Lou Who is in the book, she retells. Not exactly in the words of the original story. No, but in a very close paraphrase. Everything that happens happens in the same sequence with the same plot. And there is simply no ridicule, reversal, darkening, or any of the things that we expect to see in a transformative work. Your argument was perhaps that it so ridicules and so darkens the existing work that it impinges on the value of the work. Not that it doesn't darken and somehow affect the work. Because that might be a concern of the law, that a work transforms it in a way that makes the original work worthless, because it's now no longer going to be viewed as what it was, a children's story. Well, I'll turn to that as soon as I talk about the third factor, because let's assume that it was a parody, as Mr. Lombardo asserts that it is. There is an enormous amount of the original taken. Far more than in any of the parody cases that this court's looked at that involved literary works. As I say, 60 lines of the original are simply taken. This court said in TCA television that it is the burden of the defendant, who has the burdens on all issues on fair use, to provide a persuasive justification for taking as much as he took. And Mr. Lombardo simply doesn't do this. All he says is, well, I'm trying to reacquaint the audience with the characters so they know where they are. Well, this is a famous children's book. We may all know it. I don't know, but certainly our children do if we don't. And the excessive taking is itself a factor cutting against fair use. It's the setting for the parody. But even with a parody, if you go to Campbell, the Supreme Court case on Two Live Crew, the court found it was a parody, but the court remanded for a determination of whether too much was taken of the music. And at a minimum, we have the right to go back to the district court and establish that too much was taken, even were this truly a parody. You can exceed the test is reasonable necessity, and I believe it was exceeded here. Let's go to the You have a short in length story. Obviously, I'm not going to read my kids, wouldn't have read my kids to bed with some long novel. So we have a short story. How much is too much of a short story? Your Honor, it truly depends. There are no bright lines in fair use. All we can really say is So reasonable judges can differ on that? They can, but this goes beyond, but the test is reasonably necessary. And 60 lines in the play, one third of the play, one half of the Grinch book is more than reasonably necessary. When you come to the point that the original, most of the original elements are never referred to again. They're not made fun of. They're not darkened. They're not shown in a different context. They're just there to entertain the audience. I do want to move to the fourth factor, which is the most important, market impact. This was a Rule 12 motion. We alleged, credibly and plausibly, that Dr. Seuss has been licensing The Grinch for all sorts of other works, for theatrical adaptations, and has made money off of it, and that this is an active licensing market. Under the court's decision in TCA Television, the district court was required to find this factor in favor of my client, and it did not. It used what I can only say was its gut instinct to say, nobody who's going to go see the Who's Holiday play will ever go to see a play of the Dr. Seuss. Well, it is a different audience. That's a fact, Your Honor. It's never been proven. It's a matter for evidence. No one would suggest that children should see this play. We are not suggesting that children would either. We are suggesting that Dr. Seuss can license to adult audiences, can license this story, but adult doesn't necessarily mean obscene or references to drug use or bestiality, as the district court thought was important. What it means is that it's appealing primarily to adults, and we have the right to present facts to that evidence. The fourth factor is inherently factual. In Campbell, the Supreme Court remanded on the fourth factor to find whether the defendant's use of the music impaired the plaintiff's right to authorize a rap song based on Oh, Pretty Woman. We have that right, and we were denied it. We think that we are going to ‑‑ the burden remains on Mr. Lombardo to prove each of these elements. We don't have the burden, but we think we can show in the district court that this would indeed impair our ability to license authorized adult versions of the Grinch. Thank you. You've reserved two minutes for rebuttal. Thank you, Your Honor. We'll hear from plaintiff here. Plaintiff appellant. Appellee. Thank you, and may it please the court, Jordan Greenberger for Matthew Lombardo. Mr. Lombardo's play, Whose Holiday, is a fair use of How the Grinch Stole Christmas by Dr. Seuss. The works speak for themselves. We asked the district court to do exactly what we're asking this court to do, which is simply read the play, read the book, compare the two, and analyze it under relevant fair use case law. I have the fourth point opposing counsel just made, that they have a right to market other versions of the Grinch to adults, to anyone else, and that that is a factual consideration, and they never had an opportunity to put in facts on that. Sure, and that's exactly where the rubber meets the road in this case, is whether or not they should have had an opportunity to put in a factual submission on the market harm factor, which is the fourth fair use factor. As an initial matter, they could have put in facts, okay? Nothing stopped them on . . . The district court didn't even have a hearing. He decided this on papers, didn't he? You're right, Your Honor, but as the court knows, on a Rule 12 motion, sometimes people will put in an affidavit or a declaration, and the court has the right to then convert it to a motion for summary judgment. All they did . . . We hardly fault a party dealing with that kind of a motion for not making a summary judgment submission instead. Fair enough, Your Honor. I'm merely suggesting that . . . But you're arguing that we shouldn't hear them to complain about this now, because they could have put papers in. The district court ruled on Rule 12, and they're saying, you know, until we're given the opportunity to litigate this question, a decision shouldn't have been made. At Rule 12, it's not possible to decide this question. Respectfully, it was. That's what the Seventh Circuit did in the Brownmark case, which this court in Cariou called instructive. It's what the district court did in the Ajme case, which has really been at the forefront of this case from day one, before the lawsuit was even commenced. There's another district court case called Arrow, which involved a fair use of a pornographic film into a biographic film, and courts have rejected the need for discovery, okay? There's another case, there's a southern district case in New York called Mattel against Pitt, and there's a Ninth Circuit case called Mattel against Walking Mountain Productions that had to do with Barbie doll, okay? And these were uses of Barbie dolls that were in a sexualized manner, dressed in S&M costumes and other suggestive positions. And the Ninth Circuit said, we think it's fair to assume that Mattel, the maker of Barbie dolls, would never authorize the use like this, okay? Which leads to another important point. The play is a parody. They can't control the market for parodies, no matter what. We have the right to criticize and comment, especially on a work that is famous, and that they allege Soussian is in the dictionary, okay? Literally, the dictionary definition of Soussian says, How the Grinch Stole Christmas, which is a whimsical, childlike play. We have the right to comment on that, and they don't have the right to stop us. There's another case called Keeling against Haars, where this court said the fair use finding by a jury was fine. The district court didn't even instruct the jury on factor number four. The only instruction was on factor number one, which was the transformative use, and the court said that was okay. That wasn't reversible error, because in the case of a parody, the other factors are reduced, factors two, three, and four. They're all interrelated, but in a case like this, where it's a parody, on its face, the factor for market harm is of less importance. What about the fact that you used 60 lines from the original? Speak to that. I invite the court to read those alleged 60 lines, which is the first 14 pages of the book. It does not state verbatim anything from the book. It alludes to the story to reacquaint the audience as to what it's with. Actually, the only thing I was rereading the book and the play recently, the only thing it says the same is the word who hash. In the book, who hash is something that the Grinch steals from a refrigerator, like a can of corned beef hash or something like that. In the play, it's a cannabis subject that she smokes because of her addiction to drugs and abuse of drugs and alcohol. That's literally the only words that mirror, in the first 14 pages, the book. Now, to his point that it's an abridgment, fair use, factor three, says you can conjure up the original. In fact, in the case of a parody, you can go right to the heart. How else would we have parodied the book unless we reminded the audience of what happened in the book? The second thing they say is it's a sequel. This does not translate. I understand. It's a sequel in the sense that the characters shared a single Christmas Eve together when Cindy Lou was not more than two. After that, it takes a drastic left or right turn. The case at the district court and on appeal that they rely upon is the Salinger against Colting case, which had to do with a sequel of The Catcher in the Rye. There, the characteristics in the sequel of the characters was the same. They had the same personality traits. They used the same language. Where in the book does it suggest that this Cindy Lou Who would grow up, have premarital sex with the Grinch, have his baby. Her parents would reject the baby and reject her, that she would have to work for the circus cleaning up elephant dung and then murder her husband after they've ate the family dog. Where in the book does it suggest that that's their characteristics? I thought she didn't murder him, but that it was accidental. Your Honor, I stand corrected. I don't remember what the term was. I understand your adversary's argument, though. Suggesting that they have the right to anything that talks about what happens after the events of the book and that you do not somehow come within the protection of parity just because you chose to tell the sequel in a particularly crude way. Now, do you want to tell us why you don't think that that is an argument that they should be allowed to pursue? Sure. And particularly in a context where they've pointed out that they have not merely published the book. They have licensed any number of uses of the character and the story and that you don't suddenly acquire the right to sequels by telling a crude rather than a touching sequel. Two things, Your Honor. The first is that Dr. Seuss is conflating derivative works with transformative works. And footnote six of the Keeling case, which also involved a derivative work, it was a stage adaption of a movie. A movie certainly has the derivative right to turn into a stage play. The court said there are different things. A derivative work transforms the form. A transformative work transforms the purpose. Here, it's transforming the purpose for common criticism. That's the first point I wanted to make. The second point is Dr. Seuss has a bit of wordplay in their argument that they have the right to do things that appeal to adults. There's a difference between appealing to adults and something that's geared or targeted solely to adults. This is not a reasonable, traditional, or likely market that they're going to go into. They allege a number of derivative markets that they've entered. They allege a musical. They allege a movie. There's a movie coming out this fall which happens to be a cartoon. They have a 2000 movie starring Jim Carrey that's rated PG. This is not a PG movie. An adult can be interested and like a movie that appeals to children as well. I will give you that the book appeals to adults who are probably reading it with their children around the holiday. It does not mean that they have the market to do something that is solely geared towards adults. The website itself says this is a parody in mature audiences only. The website meaning the one that Mr. Lombardo had for the tickets. Again, that even assumes that they have the right to control the derivative market for fair use. It's a parody. They cannot control the market for parodies. I hope that addresses your question on factor number four. Are there any other factors that the court wants to address or can I turn to the trademark question? Go to the trademark. Okay. Thank you. The trademark claims have always been somewhat of a sideshow in this case. The briefings suggest and all of the allegations have really focused on the fair use copyright issue. On the trademark thing, what they allege to be an ad, it really wasn't an ad. There's no allegations in the complaint as to where, when, how it was. Was it on TV, in a magazine? It wasn't. It was an invitation sent by email to a select group of private investors. None of these people would have been confused as to whether or not this was authorized by Dr. Seuss. They're investing or would have been investing hopefully tens of thousands of dollars. There would have been a number of disclosures made to them. It would have said Matthew Lombardo's name on it. So there would have been no confusion. But turning to the substance, the Rogers test says when the purpose is to amuse and not to confuse, the Lanham Act should be construed narrowly. There's a two-factor test. The first is, is it artistically relevant? And the second is, is it explicitly misleading? It's artistically relevant because it refers to the parody of Dr. Seuss. And it's not explicitly misleading because nowhere does Dr. Seuss even mention, it says, it's written and directed by Matthew Lombardo. I see that my time is up if there's no further questions. Sure. With respect to parodies, and we'll use yours as the example, where the parody is dependent upon the innocence of the original Seuss work, does there come a point at which the parody destroys the value of the original work precisely by rendering it no longer innocent, where that is the essence of its market? I suppose there could be a parody that destroys the market. But in Campbell, the Supreme Court case, the Supreme Court says, you know, a lethal book review, which is fair use, can destroy the market for people buying the book because nobody's going to want to read a book that gets a terrible review. And the Supreme Court in Campbell said that that— that's a different type of use, critical commentary. Parody is making fun of the original work, and that is an accepted use, but I'm wondering whether the holder of the work can say, the value of my work is that people in this market know that these works are purely innocent and appropriate for children under the age of 10, et cetera. By parodying it in the way you do, you're actually adversely affecting my market because now people are not sure that Seuss works fit that audience. Is that something that the courts should even consider? I submit that if they should, it's not this case, Your Honor. If anything, the play, anybody who's going to see it is going to say, I really like that book. I'm glad that I had a laugh at its expense. I don't believe—I'll also point out that they never allege that, and in their reply brief, I believe on page 5, they say, we're not alleging any harm to the original book itself. They're only focusing on the derivative market, which is the alleged sequel. Doesn't there come a point when parody can converge with critical commentary, at least come close to intersecting? I would say that's exactly what parody is. The point is to have a laugh while also commenting on the original and whatever comment the author has on it. And if the author's ultimate comment is, this is ridiculous, meaning the original, and conveys that by way of parody, that approaches critical commentary, does it not? Yes, Your Honor. Thank you. If there's no further questions. Thank you, counsel. Mr. Deutsch, you reserve two minutes for rebuttal. Thank you, Your Honor. I'm going to focus on the fourth factor. The fourth factor doesn't just ask the court to take a look at this play. The test, as it's stated in Campbell and as Judge Radji said in her opinion in TCA Television, is if everyone could take as much from the Grinch as Mr. Lombardo has taken, what would be the effect on my client's ability to license it? That is a factual question, which we suggest to you we have had no opportunity to develop. If we find that there is fair use in creating a parody, doesn't that overwhelm the fourth factor? It shouldn't in this case, Your Honor. First of all, because as we say, we think not only are the parodic elements weak, but the amount taken from the original far too excessive to be reasonably necessary. And in any event, there is no case where the cases that my colleague has cited are cases where the plaintiffs did not say you are expropriating or affecting one of our markets. In none of those cases did they actually make allegations with respect to the fourth factor. We have. The Supreme Court has said you must consider all four factors and then you must consider them holistically. That wasn't done by the district court. On the first factor, we do believe that the court has to take a much closer look as to whether or not this is a true parody, particularly the second half. On the third factor, we believe the court has to take a look at both of them, both the original and the Lombardo works, and say did they need to take all this as a reasonably necessary purpose if there is a parody. And on the fourth factor, we have our procedural rights, which we were denied. We were at a motion for judgment on the pleadings, and we had to take the court at its word that they were making the determination on the pleadings that they were going to take our allegations of market harm and accept them and take them as true as you're supposed to do on a Rule 12C motion. Because the district court didn't do that and because of its other errors, we ask the court to reverse and remand. Thank you. Thank you both. Just in case, we'll reserve decision. I could have done that in rhyme, but I wasn't up to it.